**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

**UNITED STATES OF AMERICA**

**v.**                                         **CASE NO. 3:25-cr-43-MCR**

**TERRANCE JOSIAH FASOLD**

_____/

## ORDER

In autumn 2024, a string of car burglaries broke out across the Florida panhandle.  The accompanying investigation led Escambia County Sheriff's Office Investigator Robert David Preston to the Santa Rosa County Jail to interview a person of interest on October 29, 2024.  The suspect informed Investigator Preston that he sold a handgun taken during one of the vehicle break-ins to a man named "TJ" within the last couple days.  "TJ" was a younger, skinny, black man with a missing tooth that lived in Room 301 of the Red Roof Inn off Pine Forest Road in Pensacola.  After the interview concluded, Investigator Preston drove back to his office to begin preparing a search warrant for Room 301 to confiscate the stolen handgun.  En route, he contacted some of his colleagues, including Investigator Andrew Kelley, to relay what he learned at the jail.

Just after noon, Investigator Kelley and Investigator Timothy Fox arrived at the Red Roof Inn.  They confirmed with the front desk clerk that a man named "TJ"

was staying in Room 301, had been by earlier that day to extend his stay, and was currently wearing a white shirt with black pants. The two investigators planned to conduct a knock-and-talk at Room 301 to locate the stolen handgun. Before doing so, Investigator Kelley returned to his vehicle in the hotel parking lot to put on his uniformed tactical vest. Serendipitously (at least for Investigator Kelley), a rideshare was dropping off a man matching "TJ's" description and a female passenger in front of the Red Roof Inn's porte cochere.

Investigator Kelley beckoned to the man, now understood to be Defendant Terrance Josiah Fasold, to come speak with him: "Hey, TJ, come here!" Fasold ignored Investigator Kelley's call and began walking away from the hotel towards an adjacent gas station. Investigatory Kelley started lightly jogging after him and banged on the hotel atrium window to alert Investigator Fox to the developing foot chase. At this point, Fasold started running in earnest. The two investigators quickly caught up to Fasold in the gas station parking lot. During the pursuit, they noticed that Fasold was clutching a bulge on the left side of his waistline. As they attempted to restrain him, they noted Fasold making "furtive" movements with his legs and hands—as though he was trying to dislodge something from his belt or pants. Neither investigator saw anything fall to the ground. Fasold was handcuffed, searched, and walked back to the front of the hotel. When they returned, the

CASE NO. 3:25-cr-43-MCR

investigators surmised that the female passenger accompanying Fasold had departed the hotel in a black crossover SUV.

The front desk clerk verified that Fasold was the current tenant of Room 301 and provided a room key. Investigator Fox and two freshly arrived law enforcement officers headed up the lobby elevator to Room 301 to perform a "protective sweep" of the suite. Investigator Kelley stayed with Fasold until more backup arrived. Minutes later, reinforcements pulled in, and Fasold was searched again and placed in the rear of a patrol vehicle.

Now things began to move fast—and not in a good way for Fasold. With near simultaneity, Investigator Kelley walked back to the adjacent gas station parking lot to search for items Fasold may have discarded during the struggle to handcuff him, and Investigator Fox unlocked the door to Room 301. Under a sedan in the vicinity of where Fasold was handcuffed, Investigator Kelley located a tightly wound bag containing a blue substance, which later field tested as approximately 95 grams of fentanyl. In Room 301, Investigator Fox observed large quantities of narcotics scattered throughout.

Investigator Kelley communicated the parallel discoveries and the afternoon's events to Investigator Preston, who was still drafting the search warrant for Room 301. Investigator Preston submitted the search warrant application after securing

CASE NO. 3:25-cr-43-MCR

supervisor approval.  *See* ECF No. 22-1.  In addition to detailing the preceding investigation into the stolen handgun, his affidavit stated that investigators on scene "discovered a plastic bag where Fasold was detained" containing fentanyl and that "numerous amounts of illegal narcotics were observed in plain view and in large quantities" during the "protective sweep" of Room 301.  *Id.* at 3.  Judge Stephen A. Pitre of the First Judicial Circuit in Escambia County promptly signed the warrant, authorizing law enforcement to search for the stolen handgun, ammunition, illegal drugs, and cash.  The subsequent search of Room 301 uncovered multiple handguns, including the one the police were originally tracking, and a cache of narcotics, including fentanyl, cocaine, marijuana, and methamphetamine.

On February 19, 2025, a federal grand jury returned a three-count indictment against Fasold.  *See* ECF No. 1.  Fasold is charged with possession of narcotics with intent to distribute, possession of a firearm in furtherance of drug trafficking, and possession of a firearm and ammunition by a convicted felon.  *Id.*  Presently, Fasold has moved to suppress the evidence against him, including the baggie of fentanyl found in the parking lot after he was nabbed and the stash of narcotics and weapons later found in his hotel room.  ECF No. 22.  The Government opposes that motion. ECF No. 23.  The Court held an evidentiary hearing on July 3, 2025, and heard testimony from Investigators Preston, Kelley, and Fox.  The parties also introduced

CASE NO. 3:25-cr-43-MCR

into evidence various photographs and bodycam footage from the events of October 29, 2024.  *See* ECF No. 28.

## I.    Discussion

The Fourth Amendment safeguards the rights of the people to be free from unreasonable searches and seizures.  U.S. Const. amend. IV.  Over a century ago the Supreme Court established the exclusionary rule, which generally prohibits the Government from relying on evidence obtained in violation of the Fourth Amendment.  *See Murray v. United States*, 487 U.S. 533, 536–37 (1988); *see also Weeks v. United States*, 232 U.S. 383, 398 (1914).  The rule endeavors to "compel respect" for the Fourth Amendment "by removing the incentive to disregard it." *Elkins v. United States*, 364 U.S. 206, 217 (1960).  Fasold's motion implicates both facets of the Fourth Amendment: first, arguing that he was unconstitutionally seized when he was arrested without probable cause; and, second, challenging the subsequent warrantless "sweep" of his hotel room as an unlawful search.

### A.    The Foot Chase

Let's begin with the basics.  Not all interactions with police officers are "seizures" under the Fourth Amendment.  *See Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968).  Rather, for purposes of the Fourth Amendment, encounters between police and citizens exist on a continuum: "(1) police-citizen exchanges involving no

coercion or detention; (2) brief seizures or investigatory detentions; and (3) full-scale arrests." *See United States v. Perez*, 443 F.3d 772, 777 (11th Cir. 2006). The focus is on whether a person's freedom of movement was restrained by physical force or by submission to a show of authority. *See California v. Hodari D.*, 499 U.S. 621, 626 (1991) (absent the use of physical force, a seizure requires both a show of authority and "*submission* to the assertion of authority"). Fasold's encounter with the investigators progressed through all three categories—none of which violated the Fourth Amendment.

Investigator Kelley's initial approach did not arise to a seizure. Police officers do not violate the Fourth Amendment "merely by approaching individuals on the street or in other public places" and asking questions. *United States v. Drayton*, 536 U.S. 194, 200 (2002); *see Kentucky v. King*, 563 U.S. 452, 463 (2011) ("Officers may seek consent-based encounters if they are lawfully present in the place where the consensual encounter occurs." (citation modified)).[1] "The societal pressure to stop and speak with law enforcement is not a sufficient restraint of liberty to raise the interaction to a level that requires constitutional protection." *United States v. Baker*, 290 F.3d 1276, 1278 (11th Cir. 2002). Provided that a reasonable person

---

[1] No one disputes that Investigators Kelley and Fox were lawfully present on scene.

CASE NO. 3:25-cr-43-MCR

would feel free to terminate the encounter, "disregard the police, and go about his business," an exchange is consensual.   *Hodari D.*, 499 U.S. at 628 (citation modified); *see United States v. Drayton*, 536 U.S. 194, 201 (2002) ("Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search . . . provided they do not induce cooperation by coercive means.").  By calling out "Hey, TJ, come here!" Investigator Kelley did not effect a seizure.  *See Hodari D.*, 499 U.S. at 626 ("The word 'seizure' . . . . does not remotely apply . . . to the prospect of a policeman yelling 'Stop, in the name of the law!' at a fleeing form that continues to flee.").  At most, that amounted to an "attempted seizure."  *Brendlin v. California*, 551 U.S. 249, 254 (2007).  Fasold never actually submitted to any "show of authority" until he was "physically overpowered" by the investigators and handcuffed in the neighboring gas station parking lot.  *Id.* at 261–62 (citation modified); *see also Hodari D.*, 499 U.S. at 626 (explaining when an individual flees from police, he is not submitting to their authority and is therefore not seized); *United States v. Brown*, 852 F. App'x 524, 527 (11th Cir. 2021) (same).  Only then was he seized for an investigatory stop.

The next question is whether the investigators had a sufficient justification to detain Fasold.  They did.  Police officers may seize a suspect for a brief investigatory

stop when they possess reasonable suspicion that the suspect was involved in, or about to be involved in, criminal activity. *See Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). Reasonable suspicion is a less demanding standard than probable cause, but the Fourth Amendment still requires an objective justification—based on specific and articulable facts coupled with rational inferences from those facts— before the police can make an investigatory stop. *Id.* "The totality of the circumstances—the whole picture—must be taken into account," *United States v. Cortez*, 449 U.S. 411, 417 (1981) (citation modified), and "great deference is given to the judgment of trained law enforcement officers on the scene." *United States v. Chanthasouxat,* 342 F.3d 1271, 1276 (11th Cir. 2003). Crucially, "none of the suspect's actions need be criminal on their face. *See United States v. Lee*, 68 F.3d 1267, 1271 (11th Cir. 1995). "Reasonable suspicion may exist even if each fact alone is susceptible to an innocent explanation." *United States v. Hunter*, 291 F.3d 1302, 1306 (11th Cir. 2002) (citation modified). In other words, when it comes to reasonable suspicion, sometimes zero plus zero equals one. However, reliance on a mere hunch is insufficient. *See United States v. Arvizu*, 534 U.S. 266, 274 (2002).

In this case, taking a step back brings the broader picture into focus: the investigators, while understandably trying to locate a stolen firearm, attempted a consensual encounter with its suspected buyer, who immediately fled—first by

walking, then by running—and did so while clutching an unidentified object near his waistband upon sight of the police.[2]  While "refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure," *Florida v. Bostick*, 501 U.S. 429, 437 (1991), "unprovoked flight is simply not a mere refusal to cooperate" or just "going about one's business," *Wardlow*, 528 U.S. at 125.[3]  Flight is generally suggestive of wrongdoing, especially when it is in response to the presence of uniformed police officers.  *See id.* at 124 ("Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such."); *United*

---

[2] The investigators also corroborated much of what the jailhouse informant provided soon after arriving at the Red Roof Inn.  They confirmed with the front desk clerk that a "TJ" matching the description of the man they were looking for occupied Room 301, and the clerk also provided information about the clothing Fasold was seen wearing earlier that day.  Moments later, Investigator Kelley recognized Fasold in the parking lot based on his physical characteristics and clothing.

[3] The presence of the investigators surely provoked Fasold's flight in some sense.  But the focus is on "improper provocation," *Franklin*, 323 F.3d at 1303 n.4, like "when an officer insufficiently or unclearly identifies his office or his mission."  *See Wong Sun v. United States*, 371 U.S. 471, 482 (1963).  In those cases, a suspect's flight cannot support reasonable suspicion.  Take, for example, the Seventh Circuit's decision in *Marshall ex rel. Gossens v. Teske*, 284 F.3d 765 (7th Cir. 2002).  *See Franklin*, 323 F.3d at 1302 (citing *Marshall* favorably).  In *Marshall,* the defendant was faced with masked men running at him with guns.  *See* 284 F.3d at 768.  Those masked men happened to be undercover police officers.  *Id.*  But the defendant didn't know that, so he ran.  The Seventh Circuit reasoned that the defendant's flight could not support reasonable suspicion under those circumstances because he "did what any sane person would do if he saw masked men with guns running toward him: he ran like hell."  *Id.* at 771.  By contrast, Fasold clearly understood Investigator Kelley to be a law enforcement officer, and his flight was "from the law instead of from a perceived place of danger."  *Franklin*, 323 F.3d at 1303.

*States v. Franklin*, 323 F.3d 1298, 1302 (11th Cir. 2003) (finding reasonable suspicion when suspect "ran away at full speed as soon as he saw the officers"); *Hunter*, 291 F.3d at 1306 (turning and walking quickly away from officers supported finding of reasonable suspicion); *United States v. Gordon*, 231 F.3d 750, 756 (11th Cir. 2000) (characterizing flight as "powerful evidence" of criminal activity when conducted in an area known to host high levels of criminal activity).[4]   The fact that Fasold was clutching an object near his waistline while running (which a reasonable officer could infer to be a firearm) rightly amplified the investigators' suspicions. *See United States v. Barnes*, 2024 WL 4971994, at *3 (11th Cir. Dec. 4, 2024), *cert. denied*, 145 S. Ct. 1910 (2025) ("The presence of 'a visible, suspicious bulge' in an individual's clothing may also give rise to reasonable suspicion, particularly when the individual is present in a high-crime area." (citation omitted)); *Hunter*, 291 F.3d at 1306 (same); *see also United States v. Gibson*, 64 F.3d 617, 624 (11th Cir. 1995) ("Law enforcement officers are at greatest risk when dealing with potentially armed individuals because they are the first to confront this perilous and unpredictable

---

[4] At the very least, the investigators were entitled to briefly detain Fasold to sort out why he fled.  *See Franklin*, 323 F.3d at 1302 ("Innocent persons might run from police officers; but flight creates an ambiguity; and the officers may stop the person to resolve the ambiguity.").

situation."). The constellation of circumstances readily demonstrates that there was reasonable suspicion for the investigators to detain Fasold.

The rest falls into place from here. Shortly after Fasold was detained and placed in the back of patrol vehicle, Investigator Kelley returned to the gas station parking lot and found the baggie of fentanyl that he believed Fasold jettisoned while being handcuffed.[5] At this point, Fasold's detention matured into a full arrest, which was amply supported by probable cause. *See Davis v. City of Apopka*, 78 F.4th 1326, 1334 (11th Cir. 2023), *cert. denied*, 144 S. Ct. 2528 (2024) (arrests must be justified by probable cause, but that "does not require that it be more likely than not the person arrested for a crime is actually guilty of it").[6] None of the foregoing violated

---

[5] The Court cannot say for certain that the baggie of fentanyl was abandoned by Fasold such as to deprive him of Fourth Amendment standing. *See Hodari D.*, 499 U.S. at 629 (holding that an individual is not seized while fleeing police and items abandoned during the chase are not evidence susceptible to exclusion). While it is clear that Fasold meant to part with the baggie, it is ambiguous whether this occurred before, during, or after he was apprehended. If Fasold discarded the baggie before he was seized, it is properly considered abandoned and cannot be suppressed, even if his seizure was unlawful, because he would lack Fourth Amendment standing to challenge its subsequent discovery. *Id.* But if Fasold did so during or after the seizure, the answer is far murkier. *See United States v. Dolomon*, 569 F. App'x 889, 893 n.2 (11th Cir. 2014) (collecting cases and observing that "several decisions from other courts" hold "that property abandoned *after* an illegal seizure is subject to suppression under the Fourth Amendment"). Fortunately, law enforcement dealt with Fasold in accordance with the Fourth Amendment every step of the way, so there's no need to enter the fray on this score.

[6] To be sure, the investigative stop did not ripen into an arrest simply because Fasold was placed in handcuffs, *see United States v. Hastamorir*, 881 F.2d 1551, 1557 (11th Cir. 1989), or placed in the back of a patrol vehicle, *see United States v. Fields*, 178 F. App'x 890, 893–94 (11th Cir. 2006) (when suspects ignore an officer's attempt to "engage him in conversation" and walk away, an officer's "action in handcuffing a defendant or securing him in a patrol car does not

Fasold's Fourth Amendment rights, so there is no basis to suppress the baggie of fentanyl found near where Fasold was apprehended.

### B.    The Hotel Room Sweep

But we're not out of the woods yet.  Following his detention, Fasold also claims that members of the Escambia County Sheriff's Office searched his hotel room unconstitutionally when they entered before securing a warrant.  At the "very core" of the Fourth Amendment is "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion."  *Silverman v. United States*, 365 U.S. 505, 511 (1961); *see also Florida v. Jardines*, 569 U.S. 1, 6 (2013) ("When it comes to the Fourth Amendment, the home is first among equals." (citation modified)).  The "chief evil" the Fourth Amendment protects against is the government's warrantless physical entry into a person's home.  *See Coffin v. Brandau*, 642 F.3d 999, 1009 (11th Cir. 2011) (en banc) (quoting *Payton v. New York*, 445 U.S. 573, 585 (1980)).  "No less than a tenant of a house, or the occupant of a room in a boarding house, a guest in a hotel room is entitled to constitutional

---

automatically convert a *Terry* stop into an arrest," because it may be "reasonably necessary to preserve the status quo").  Similarly, the duration of Fasold's detention before the baggie of fentanyl was located, which looks to be under 15 minutes, did not transform the stop into a full-scale arrest.  *See United States v. Hardy*, 855 F.2d 753, 759 (11th Cir. 1988) (approving 50-minute investigative stop).  Investigators Kelley and Fox acted reasonably and expeditiously to confirm or dispel their suspicions after Fasold fled.  They ended up confirming them, leading to Fasold's arrest.

protection against unreasonable searches and seizures." *Stoner v. California*, 376 U.S. 483, 490 (1964) (internal citation omitted); *see also United States v. Forker*, 928 F.2d 365, 370 (11th Cir. 1991) (observing that "a motel room, however temporary, is equivalent to one's home" for Fourth Amendment purposes).

### i.    Exceptions to the Warrant Requirement

Warrantless searches are presumptively unreasonable. *See Coolidge v. New Hampshire*, 403 U.S. 443, 474–75 (1971). However, there are exceptions to the warrant requirement. *See Riley v. California*, 573 U.S. 373, 382 (2014) ("In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement."). Those exceptions are "jealously and carefully drawn." *Georgia v. Randolph*, 547 U.S. 103, 109 (2006) (citation omitted). Two are implicated by the facts of this case: (i) the exception for "protective sweeps," *United States v. Yarbrough*, 961 F.3d 1157, 1166 (11th Cir. 2020); and (ii) the exception for "exigent circumstances," *United States v. Holloway*, 290 F.3d 1331, 1334 (11th Cir. 2002). The burden of proving these exceptions lies with the Government. *United States v. Jeffers,* 342 U.S. 48, 51 (1951).

Originally, the Government half-heartedly defended the warrantless entry into Fasold's hotel room as a lawful protective sweep. *See* ECF No. 23 at 9; *see also Maryland v. Buie*, 494 U.S. 325, 327, 334 (1990) (holding that a lawful protective

CASE NO. 3:25-cr-43-MCR

sweep "is a quick and limited search of premises . . . . conducted to protect the safety of police officers or others," when there are "articulable facts which, taken together with the rational inferences from those facts," that "warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene").  Wisely, however, the Government renounced any reliance on this exception at the evidentiary hearing.  After all, the putative protective sweep was not performed in the area where Fasold was detained (the gas station parking lot); it was conducted hundreds of feet away, up two floors, and behind a locked hotel room door.  That can hardly be characterized as the police taking steps to secure an arrest scene from hidden assailants.  *Cf. United States v. Holland*, 2025 WL 1547133, at *8 (N.D. Fla. May 30, 2025) (collecting cases).

Instead, at the evidentiary hearing, the Government urged the Court to find that exigent circumstances, namely the potential destruction of evidence, excused the warrantless entry.  This won't do either.  A warrantless search may be justified "where both probable cause and exigent circumstances exist."  *Kirk v. Louisiana*, 536 U.S. 635, 638 (2002).  This exception "applies when the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment."  *King*, 563 U.S. at 460.  It demands a "now or never situation."  *Riley*, 573 U.S. at 391 (citation modified).

CASE NO. 3:25-cr-43-MCR

For example, law enforcement needn't procure a warrant before entering a home to render emergency care to "seriously injured" occupants, *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006), enter a "burning building" to extinguish a raging fire, *Michigan v. Tyler*, 436 U.S. 499, 509 (1978), or stop a burglary in progress, *Montanez v. Carvajal*, 889 F.3d 1202, 1208–09 (11th Cir. 2018).

The Government is correct that exigent circumstances may exist in less extreme cases too, like "when there is danger that the evidence will be destroyed or removed." *United States v. Tobin*, 923 F.2d 1506, 1510 (11th Cir. 1991) (en banc). In those situations, courts ask whether the totality of the circumstances would lead an objectively "reasonable, experienced agent to believe that evidence might be destroyed before a warrant could be secured." *Id.* This turns heavily on the "facts on the ground." *Lange v. California*, 594 U.S. 295, 302 (2021). And a "court must be able to identify specific facts that constitute an exigency," based on what was known to the police at the time of the warrantless search. *See United States v. Bradley*, 644 F.3d 1213, 1262 (11th Cir. 2011).

Take stock of what law enforcement knew and what they did not when entering Room 301. At this point, law enforcement believed that the stolen handgun was located in Room 301, they knew that the suspected buyer, Fasold, had just run from them clutching something near his waistband, and they knew that Fasold was

occupying Room 301.  On the flipside, law enforcement did not know that Fasold had ditched a baggie of fentanyl when he was handcuffed or have any hint that there might be narcotics in Room 301.[7]  And although "it was not necessary for the officers to hear the toilet flush or other noises suggesting that evidence was being destroyed" before entering, *United States v. Reed*, 318 F. App'x 774, 776 (11th Cir. 2009), there was also no indication that there was anyone inside Room 301.  In fact, the only other person law enforcement thought might have access to Room 301 was the female that was dropped off with Fasold.  But Investigator Kelley observed her leave the Red Roof Inn in a black crossover vehicle *before* his colleagues entered Room 301.[8]

The exigency exception is appropriate only when time is not on the police's side.  *See Lange*, 594 U.S. at 302.  If the police have time to get a warrant, they

---

[7] The Government's exigency argument may have been marginally more persuasive had the police believed narcotics were in Room 301 beforehand.  *See United States v. Santa*, 236 F.3d 662, 669 (11th Cir. 2000) (exigent circumstances exception is "particularly compelling in narcotics cases" because courts recognize that drugs can be easily and quickly destroyed); *cf. United States v. Lynch*, 934 F.2d 1226, 1232 (11th Cir. 1991) ("The mere presence of contraband, however, does not give rise to exigent circumstances.").

[8] Although Investigator Fox offhandedly testified that law enforcement was generally concerned that Room 301 needed to be "clear[ed] . . . to make sure that the female wasn't in there destroying evidence," he effectively conceded on cross examination that he did not possess any specific facts to support that concern.  Investigator Fox, to the Court's knowledge, was the first person to insinuate that law enforcement was worried about evidence being destroyed before a warrant could be obtained.  The warrant affidavit labeled the initial entry a "protective sweep," and never referenced any destruction-of-evidence rationale.  *See* ECF No. 22-1 at 3.  The Government did not argue that the exigency exception applied in its written opposition.  *See* ECF

CASE NO. 3:25-cr-43-MCR

should.  *Id.*  "The mere fact that law enforcement may be made more efficient can never by itself justify disregard of the Fourth Amendment."  *Mincey v. Arizona*, 437 U.S. 385, 393 (1978).  Here, the problem is that, after Fasold was detained, there was plenty of opportunity to secure a warrant for Room 301—Investigator Preston was already in the process of drafting one.  Nothing suggested that the police needed to act with urgency, and they "could have easily prevented any . . . destruction or removal by merely guarding the door" until a warrant issued.  *Jeffers*, 342 U.S. at 52.

The warrant requirement is not an empty formality: it guarantees "a right of personal security against arbitrary intrusions by official power," by ensuring that police officers "engaged in the often competitive enterprise of ferreting out crime" are not the lone interpreter of the Fourth Amendment's protections.  *See Coolidge*, 403 U.S. at 449, 455 (citation modified).  The Escambia County Sheriff's Office short-circuited the constitutionally prescribed process when they entered Fasold's hotel room without a warrant, consent, or any emergency to justify the intrusion.

---

No. 23.  And none of the "facts on the ground" lend credence to Investigator Fox's abstract concern.  *Lange*, 594 U.S. at 302.  In fact, as noted above, they cut the opposite way.  In the bodycam footage, Investigator Kelley can be heard radioing to other law enforcement to search for a "black crossover . . . may have been a Nissan" approximately two minutes before other members of the Escambia County Sheriff's Office entered the elevator to go up to Room 301.  *See* ECF No. 28-1.

CASE NO. 3:25-cr-43-MCR

### ii.        The Exclusionary Rule

That leaves Fasold in an unfortunate, but not unfamiliar, spot.  His Fourth Amendment rights were violated by virtue of the illegal search of his hotel room, but this does not necessarily require suppression of the evidence law enforcement discovered there.  Indeed, "the question whether the exclusionary rules remedy is appropriate in a particular context has long been regarded as an issue separate from the question whether the Fourth Amendment rights . . . were violated by police conduct." *Illinois v. Gates*, 462 U.S. 213, 223 (1983).  The exclusionary rule's "sole purpose," the Supreme Court says, "is to deter future Fourth Amendment violations." *Davis v. United States*, 564 U.S. 229, 236–37 (2011).  If the exclusionary rule cannot "pay its way," *Herring v. United States*, 555 U.S. 135, 147–48 (2009), in a given case by generating enough general deterrence to "outweigh its substantial social costs," *Pa. Bd. of Prob. & Parole v. Scott*, 524 U.S. 357, 363 (1998)—namely, the fact that courts must "ignore reliable, trustworthy evidence bearing on guilt or innocence," *Davis*, 564 U.S. at 237—then the rule does not apply.  To be sure, the exclusionary rule exacts a "heavy toll on both the judicial system and society at large," because its ultimate effect "in many cases, is to suppress the truth and set the criminal loose in the community without punishment."  *Id.*  Suppressing evidence,

for that reason, is a "last resort," not a "first impulse." *Hudson v. Michigan*, 547 U.S. 586, 591 (2006).

Consequently, even where a Fourth Amendment violation has occurred, courts will not suppress evidence discovered "by means wholly independent of any constitutional violation." *Nix v. Williams*, 467 U.S. 431, 443 (1984). This qualification to the exclusionary rule is known as the independent source doctrine. Where the evidence is discovered independent of any illegality, the exclusionary rule's deterrence does not carry much force. The independent source doctrine therefore functions to place the Government in the "the same, not . . . worse, position" than it would have been but-for the police misconduct. *Id.* (emphasis omitted).

In *United States v. Noriega*, the Eleventh Circuit articulated a "two-part test" for courts to apply when "a government agent makes an initial warrantless entry that arguably violates the Fourth Amendment and then relies in part on what he saw during that entry to obtain a search warrant." 676 F.3d 1252, 1260 (11th Cir. 2012). First, courts "excise from the search warrant affidavit any information gained during the arguably illegal initial entry and determine whether the remaining information is enough to support a probable cause finding." *Id.* (internal citations omitted). Second, if the remaining information is sufficient to support a finding of probable

CASE NO. 3:25-cr-43-MCR

cause, courts "determine whether the officer's decision to seek the warrant was 'prompted by' what he had seen during the arguably illegal entry." *Id.* (internal citations omitted).

At step one, the question here is whether the investigators still possessed probable cause to obtain a search warrant for Room 301 notwithstanding the evidence tainted by the unlawful entry. The only portion of the warrant affidavit required to be excised is Investigator Preston's statement that "numerous amounts of illegal narcotics were observed in plain view and in large quantities" during the "protective sweep." *See* ECF No. 22-1 at 3 (citation modified). But that changes little about the probable cause calculus, because—concurrent with the sweep— Investigator Kelley *independently* "discovered a plastic bag where Fasold was detained containing approximately 95 grams of fentanyl." *Id.* (citation modified). Probable cause "is not a high bar." *Kaley v. United States*, 571 U.S. 320, 338 (2014). It requires only "a fair probability that contraband or evidence of a crime will be found in a particular place" under the totality of the circumstances. *See United States v. Albury*, 782 F.3d 1285, 1292 (11th Cir. 2015) (alteration in original) (quotation marks omitted). After locating a substantial amount of fentanyl in the parking lot just a few feet away from where Fasold was detained, the investigators had probable cause in spades for a warrant to search Fasold's nearby hotel room. *Id.* ("Where

evidence shows that the defendant is in possession of contraband that is of the type that one would normally hide at their residence, there is sufficient probable cause to support a search warrant." (quotation and brackets omitted)); *see also United States v. Holmes*, 141 F.4th 1183, 1195 (11th Cir. 2025) (same); *United States v. Meryl*, 322 F. App'x 871, 874 (11th Cir. 2009) (approving "district court's common-sense finding that 'drug dealers are likely to keep evidence of their drug business at home'"); *United States v. Spencer*, 530 F.3d 1003, 1007–08 (D.C. Cir. 2008) ("Common experience suggests that drug dealers must mix and measure the merchandise, protect it from competitors, and conceal evidence of their trade—such as drugs, drug paraphernalia, weapons, written records, and cash—in secure locations. For the vast majority of drug dealers, the most convenient location to secure items is the home. After all, drug dealers don't tend to work out of office buildings.").  That probable cause was obtained separately and lawfully—and it was more than enough to secure a search warrant on its own.

As for step two, there is similarly no indication that the narcotics observed during the illegal entry influenced the investigators' decision to seek a search warrant.[9]  Investigator Preston credibly testified that he decided to apply for a

---

[9] Nor is it likely, under the circumstances here, that the narcotics observed during the sneak peek at Room 301 significantly influenced Judge Pitre's decision to issue the search warrant.  *See*

warrant of Room 301 to search for the stolen handgun before his colleagues arrived at the Red Roof Inn.  Plus, at the risk of sounding like a broken record, once Investigator Kelley spotted the baggie of fentanyl—in parallel, and independent of, the illegal entry—a search warrant for Room 301 was all-but inevitable.  The independent source doctrine thus saves the fruits of the unconstitutional search of Fasold's hotel room from suppression.[10]

Accordingly, because Fasold's Fourth Amendment rights were not violated when he was seized and the exclusionary rule does not apply to the evidence observed during the subsequent "sweep" of his hotel room, Fasold's motion to suppress, ECF No. 22, is **DENIED**.  A trial date will be scheduled by separate order.

**DONE AND ORDERED** this 7th day of August 2025.

*M. Casey Rodgers*
_____
**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**

---

*Holland*, 2025 WL 1547133, at *10 n.21 (observing that, although not part of the *Noriega* test, the Supreme Court has instructed "that that the independent source doctrine applies only when the illegal search did not sway the magistrate judge's decision to subsequently grant the warrant application" (citing *Murray*, 487 U.S. at 542 n.3) (emphasis omitted)).

[10] The Government also argued that the good-faith exception announced in *United States v. Leon*, 468 U.S. 897 (1984) saves the evidence initially unearthed by the illegal entry.  The Eleventh Circuit, however, has found that the *Leon* good-faith exception is inapplicable when the police include evidence tainted by an unconstitutional search in a warrant application.  *See United States v. McGough*, 412 F.3d 1232, 1239–40 (11th Cir. 2005).

CASE NO. 3:25-cr-43-MCR